NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 17-2634

————————

ROSEMERY VANESSA ANTUNEZ; A. V. A.,
Petitioners

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent

————————

On Petition for Review of an Order of the Board of Immigration Appeals
(Agency Nos. A208-158-069, A208-158-070)

————————

Submitted Under Third Circuit L.A.R. 34.1(a)
April 16, 2018

————————

Before: GREENAWAY, JR., RENDELL and FUENTES, *Circuit Judges*.

(Opinion Filed: June 1, 2018)

————————

OPINION*

————————

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

Rosemery Vanessa Antunez seeks review, on behalf of herself and her minor child A.V.A., of a final order of the Board of Immigration Appeals ("BIA"). The BIA affirmed the decision of the Immigration Judge ("IJ") denying Antunez's request for asylum, withholding of removal, and Convention Against Torture ("CAT") protection.[1] For the reasons that follow, we will deny the petition for review.

## I.      Factual and Procedural Background[2]

Antunez and her minor child are natives and citizens of Honduras who entered the United States without being admitted or paroled. They were found to be removable under section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-1537 (2012). On January 7, 2016, Antunez filed applications for asylum, withholding of removal, and CAT protection.

In support of her applications, Antunez offered testimonial evidence and submitted documentary evidence. She testified that a relative's husband with whom she lived twice touched her legs and chest when she was eleven or twelve years old. Several years later, she was hit, insulted, and ultimately abandoned by the father of A.V.A., with whom she

---

[1]  A.V.A., the minor child, was a derivative beneficiary on Antunez's asylum application.

[2]  "We take our facts from the final order of the BIA, and to the extent the BIA relied upon it, the Immigration Judge's decision." *Sesay v. Att'y Gen.*, 787 F.3d 215, 218 n.1 (3d Cir. 2015).

2

was pregnant at the time. The man left Honduras for the Cayman Islands. A.V.A. was born in 2005.

Antunez eventually had trouble finding work to support herself and began selling second-hand clothing. Around this time, she was robbed on two occasions by different individuals, who stole her cell phone and money. In November 2014, gang members also began extorting her, ordering that she pay them money, or "rent," at the end of every month. App. 14. Specifically, two Mara 18 members appeared at her home, brandished a gun, and told her that she needed to have the money ready for them when they returned. Antunez paid them 1500 lempiras for three months. The gang members demanded 3000 lempiras in February 2015, telling her that they would kill her and A.V.A. if she did not pay rent and would harm them if she informed police. Antunez left Honduras with her minor child in March 2015, expressing concern for her safety and that of A.V.A and a belief that she was targeted because she was a single mother without a male protector. She at no time made complaints to the Honduran police.

The IJ found Antunez's testimony to be credible and entitled it to full evidentiary weight. Nonetheless, the IJ found that her experiences did not amount to persecution. He noted the sexual assault, domestic violence, robberies, and extortion to which Antunez testified. But the IJ also recognized that Antunez: (1) avoided the relative's husband who assaulted her and moved away from that house; and (2) was not physically harmed by the Mara 18, even though she knew of others who were harmed and killed for failing to pay money. While expressing sympathy about what Antunez endured, the IJ

3

concluded that "the threat of harm she has experienced and the mental anguish associated with having a child threatened . . . does not rise to the level of 'persecution.'" App. 18-19. The IJ additionally rejected the argument that she suffered from economic persecution and, even if she did, determined it was not on account of a protected ground.

Next, the IJ stated that while he was satisfied that Antunez had a subjective fear of harm, he could not find that any harm she would suffer in the future would be on the basis of her membership in a protected group. The IJ explained Antunez did not demonstrate that "single Honduran women without male protection" meets the particularity or social distinction requirements to be a cognizable social group under the INA. App. 19. Moreover, even if the IJ were to find that it was cognizable, she "has not established that her membership in the purported social group would be at least one central reason why a criminal gang member in Honduras would threaten or harm her." App. 20. Rather, the record establishes that she was a target of the Mara 18 because the gang sought economic gain, noting Antunez's testimony that members targeted both men and women of any age so long as they would pay them the money demanded.

The IJ likewise rejected Antunez's contention that she had a well-founded fear of harm by criminal organizations on account of an imputed political opinion, that is, "her opposition to the de facto government of Honduras comprised of criminal organizations and gangs." App. 20-21. He instead concluded that the gang members and other criminals were "acting out of a desire for economic gain," not on account of Antunez's political opinion, imputed or otherwise. App. 21. Because Antunez could not

4

demonstrate either past persecution or future persecution on account of a protected ground, the IJ denied her application for asylum as well as for withholding of removal.

Finally, the IJ also concluded that Antunez had "not shown that [it] is more likely than not . . . that she will be tortured in the future in Honduras, let alone with the consent or acquiescence of the government." App. 22. He did, however, acknowledge "the seriousness of violence in Honduras, Respondent's past harm, [and] the presence of corruption in law enforcement." *Id.*

Antunez appealed the decision, and a one-judge panel of the BIA affirmed. First, the BIA agreed that the instances of domestic violence did not constitute persecution, and Antunez failed to establish a well-founded fear of persecution by her relative's husband or her former partner. Moreover, the BIA found no clear error in the IJ's factual finding that Antunez's criminal persecutors were motivated by economic gain as opposed to her membership in a particular social group or her political opinion. In addition, the BIA stated that, "[w]hile the respondent has shown that there is a possibility she may be tortured if returned to Honduras, the [IJ's] determination that she has not shown a likelihood of torture with the acquiescence (including willful blindness) of a public official or other person acting in an official capacity is not clearly erroneous." App. 10. It therefore dismissed Antunez's appeal. This timely petition followed.

**II.     Jurisdiction and Standard of Review**

The BIA had appellate jurisdiction to review the IJ's removal order under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15.  We have jurisdiction pursuant to 8 U.S.C. § 1252.

Where, as here, "the BIA issued its own opinion, we review its decision rather than that of the IJ." *Patel v. Att'y Gen.*, 599 F.3d 295, 297 (3d Cir. 2010).  "However, we also look to the decision of the IJ to the extent that the BIA defers to, or adopts, the IJ's reasoning." *Id.*  "We affirm any findings of fact supported by substantial evidence and are 'bound by the administrative findings of fact unless a reasonable adjudicator would be compelled to arrive at a contrary conclusion.'" *Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009) (quoting *Yan Lan Wu v. Ashcroft*, 393 F.3d 418, 421 (3d Cir. 2005)). We review the BIA's legal conclusions de novo.[3] *Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004).

**III.    Analysis**

With respect to her asylum and withholding of removal applications, Antunez argues that the BIA erred in concluding that she had not established past persecution or a well-founded fear of future persecution on account of her status as a single woman

---

[3]  Normally, we review the BIA's legal conclusions subject to the principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Mahn v. Att'y Gen.*, 767 F.3d 170, 173 (3d Cir. 2014). *Chevron* deference, though, is inappropriate here where "we are asked to review an unpublished, non-precedential decision issued by a single BIA member." *Id.*

6

without male protection.  Antunez also contends that the BIA applied incorrect standards of review in considering the IJ's denial of her CAT claim.

## A.     Asylum and Withholding of Removal

To qualify for asylum, an applicant must demonstrate that she is "unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of [past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[4]  *Garcia v. Att'y Gen.*, 665 F.3d 496, 503 (3d Cir. 2011) (quoting 8 U.S.C. § 1101(a)(42)(A)).  To establish eligibility for withholding of removal, an applicant must demonstrate "a clear probability of persecution."  *Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)).

First, the record does not compel us to disagree with the BIA's factual finding that Antunez did not establish past persecution or a well-founded fear of persecution at the hands of her relative's husband and intimate partner.  Although the harassment she suffered was offensive and improper, it does not "constitute a threat to life or freedom." *Id.* at 1240; *see also Voci v. Gonzales*, 409 F.3d 607, 615 (3d Cir. 2005) ("[I]solated

---

[4]   The term "persecution" includes "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom," but "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Fatin*, 12 F.3d at 1240.  The persecution "must be committed by the government or forces the government is either unable or unwilling to control." *Sukwanputra v. Gonzales*, 434 F.3d 627, 637 (3d Cir. 2006) (citing *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005)).

incidents that do not result in serious injury do not rise to the level of persecution.");

*Fatin*, 12 F.3d at 1243 ("'[P]ersecution' is an extreme concept that does not include every sort of treatment our society regards as offensive."). There is also substantial evidence to support the conclusion that Antunez lacks a well-founded fear of persecution at the hands of these individuals where she and A.V.A. would not have to live or interact with either her cousin's husband or intimate partner upon return to Honduras.

Antunez's argument that the "IJ and BIA erred in discounting Petitioner's history of sexual assault and domestic violence" by considering the incidents in a vacuum is unpersuasive. Pet'r's Br. 25. Both the IJ and BIA recounted the full history of harassment and recognized its "deplorable" nature, especially given her age at the time. App. 9. Their sound conclusion that the conduct nonetheless did not rise to persecution cannot be attributed to a failure to properly consider the evidence, and we will not accept her seeming invitation to reweigh the evidence in the record.

Second, substantial evidence also supports the BIA's determination that any persecution (economic or otherwise) by gang members was not motivated by Atunez's status as a single mother. Assuming arguendo, as did the BIA, that single Honduran women without male protection constitute a cognizable particular social group, the record reflects that Mara 18 members targeted both men and women for economic gain. We cannot conclude that a reasonable adjudicator would be compelled, under these facts, to find a nexus between Antunez's feared harm and her membership in the asserted particular social group. *See Abdille v. Ashcroft*, 242 F.3d 477, 494 (3d Cir. 2001)

8

(explaining that acts of private violence put forth by the petitioner "could represent random street violence, motivated not by animosity against a particular ethnic group, but rather by arbitrary hostility or by a desire to reap financial rewards").

None of Antunez's claims on this point has merit. Her arguments about economic and other persecution at the hands of gang members and whether she established membership in a particular social group are irrelevant to our conclusion where the BIA affirmed the IJ's decision on the basis that any such persecution nonetheless lacked the necessary nexus to the purported protected ground for asylum status.[5] In addition, the persecutor's supposed knowledge of her status as a single mother without male protection does not compel the conclusion that they were *motivated* by such information. A determination that Antunez's testimony before the IJ was credible, moreover, does not require the adjudicator to adopt as a factual matter her belief that she was targeted on account of her status in a purported social group. *See Morgan v. Holder*, 634 F.3d 53, 59-60 (1st Cir. 2011) ("An IJ may reject 'speculation as to motive even while generally finding petitioner credible as to historical facts.'" (citation omitted) (quoting *Ziu v. Gonzales*, 412 F.3d 202, 204 (1st Cir. 2005))); *cf. Sandie v. Att'y Gen.*, 562 F.3d 246, 252 (3d Cir. 2009) ("[C]redible testimony alone is not always sufficient to meet the burden of

---

[5] The BIA did not need to employ de novo review on the issue of whether this requisite nexus exists. *See Huang v. Att'y Gen.*, 620 F.3d 372, 384 (3d Cir. 2010) (describing "whether [an alien] will be individually targeted based on a protected characteristic" as a "factual part of the inquiry" concerning a well-founded fear of persecution).

proof."). And documentary evidence in the record about the "wide consensus that violence against women is a fundamental problem in Honduras," Pet'r's Br. 31, does not require a different result.[6] *Cf. Abdille*, 242 F.3d at 495 ("Aside from . . . documentary evidence [about a generalized climate of hostility against the protected group], [the petitioner] furnished no evidence demonstrating that the . . . attacks he experienced . . . were not mere acts of random lawlessness . . . ."). We discern no reason to disturb the BIA's ruling as to Antunez's asylum and withholding of removal applications.

## B.    CAT Claim

An applicant for CAT protection "bears the burden of establishing that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."[7] *Kamara v. Att'y Gen.*, 420 F.3d 202, 212-13 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Sevoian v. Ashcroft*, 290 F.3d 166, 174-75 (3d Cir. 2002)). As we recently explained in *Myrie v. Attorney General United States*, 855 F.3d 509 (3d Cir. 2017):

---

[6]  Antunez argues that the decisions of the IJ and BIA do not indicate that crucial parts of her testimony and corroborating evidence were considered. But the BIA need not "discuss every piece of evidence mentioned by an asylum applicant," so long as it does not "ignore evidence favorable to the alien." *Huang*, 620 F.3d at 388. We are not persuaded that the BIA erred by ignoring or misconstruing evidence here.

[7]  For an act to amount to torture for the purposes of CAT relief, it must be: "(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions." *Auguste v. Ridge*, 395 F.3d 123, 151 (3d Cir. 2005).

To determine whether an applicant has met the burden of establishing that it is more likely than not he would be tortured if removed, the IJ must address two questions: "(1) what is likely to happen to the petitioner if removed; and (2) does what is likely to happen amount to the legal definition of torture?" In the first part of the inquiry, the IJ reviews the evidence and determines future events more likely than not to occur. . . . Accordingly, the Board reviews these factual findings for clear error. The IJ then determines whether the likely harm qualifies as torture under the governing regulations, and the Board reviews this legal conclusion *de novo*.

In assessing whether an applicant has established that public officials will acquiesce to the feared tortuous acts of a non-state actor, the IJ also must conduct a two-part analysis. First, the IJ makes a factual finding or findings as to how public officials will likely act in response to the harm the petitioner fears. Next, the IJ assesses whether the likely response from public officials qualifies as acquiescence under the governing regulations. . . . While the Board reviews the first part for clear error, it must review the second *de novo*.

*Id.* at 516-17 (citations omitted) (quoting *Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010)).

With respect to the CAT claim, the IJ did not identify what future events are more likely than not to occur upon Antunez's removal to Honduras or how public officials will likely respond to feared tortuous acts, although he did recognize "the seriousness of violence in Honduras, Respondent's past harm, [and] the presence of corruption in law enforcement." App. 22. He nevertheless concluded that "there is insufficient evidence demonstrating that it is more likely than not that the respondent would be tortured by the government of Honduras or by a private individual or group with its acquiescence or willful blindness." *Id.*

In reviewing the IJ's determination, the BIA held that the IJ's "predictive findings

11

with respect to the respondent's likelihood of torture are not clearly erroneous." App. 10. It noted the facts that the "harms and threats to [Antunez] were . . . by private actors," as opposed to public officials or persons acting in an official capacity, and that Antunez had testified that "she did not report threats or harm to the police due to her perception that doing so would have been futile." App. 10. The BIA dismissed the appeal after concluding that, "[w]hile the respondent has shown that there is a possibility she may be tortured if returned to Honduras, the [IJ's] determination that she has not shown a likelihood of torture with the acquiescence (including willful blindness) of a public official or other person acting in an official capacity is not clearly erroneous." *Id.*

We agree with Antunez that the BIA's opinion here indicates that it applied the incorrect standard of review to the IJ's decision. The BIA appears to have melded the relevant factual and legal inquiry in evaluating the CAT claim. It refers to the IJ's "predictive findings with respect to the respondent's likelihood of torture," even though the IJ made no purely factual predictive determinations in his decision.[8] *Id.* Instead, both the IJ and BIA essentially proceeded to the second question, that is, whether unspecified harm would amount to the legal definition of torture and whether the unspecified likely response from public officials qualifies as acquiescence.

---

[8] The Government argues that the IJ "resolved Antunez's CAT protection claim solely on his predictive findings about the likelihood of torture and governmental [acquiescence] in torture," Resp't's Br. 40, but the determinations in the IJ opinion are not purely factual in nature. *See Myrie*, 855 F.3d at 517.

Such an approach is not necessarily problematic. Indeed, we have previously explained that predictive factual findings are not necessary where the IJ and BIA conclude that an applicant fails to satisfy the second prong of the *Kaplun v. Attorney General*, 602 F.3d 260, 271 (3d. Cir. 2010), test summarized in *Myrie*. *See Green v. Att'y Gen.*, 694 F.3d 503, 508 (3d Cir. 2012) (finding no error where the IJ and BIA "assum[ed] a likelihood of harm under the first *Kaplun* prong and then determin[ed] that this harm would not meet the legal definition of torture under the second *Kaplun* prong"). The issue here is that the BIA expressly applied clear error review to a legal determination by the IJ that whatever might befall Antunez does not meet the legal definition of torture; the BIA should have revisited this conclusion de novo. *See Myrie*, 855 F.3d at 517.

Nonetheless, we will not remand to the BIA because the error is harmless. *See Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011) ("[W]e will view an error as harmless and not necessitating a remand to the BIA when it is highly probable that the error did not affect the outcome of the case."); *see also NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) ("[*SEC v. Chenery Corp.*, 318 U.S. 80 (1943),] does not require that we convert judicial review of agency action into a ping-pong game."). The IJ noted—and the BIA referred to—the presence of violence and law enforcement corruption in Honduras as discussed by the documentary evidence. But the background materials also highlight that the Honduran government has recently launched a special investigative unit for murders of women, initiated significant anti-corruption efforts

concerning the police force, and made substantial investments in the police and public ministry to help address crimes perpetrated by gangs. The record also includes two examples of individuals captured by the National Anti-Extortion Force for charging "rent" after it received complaints from the community. Meanwhile, the BIA noted that Antunez had not reported any conduct by the private actors to the police. Given the evidence presented, we are confident that "there is no realistic possibility that, absent the error[], the . . . BIA would have" concluded that the Honduran government's likely response to any harm suffered by Antunez would amount to acquiescence.[9] *Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 401 (2d Cir. 2005).

## IV. Conclusion

For the foregoing reasons, we will deny the petition for review.

---

[9] Antunez argues that the record compels the conclusion that the Honduran government is unable or unwilling to protect women from violence. The "unwilling or unable to" standard, however, "is not applicable to a claim for relief under the CAT." *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 611 (3d Cir. 2011).

14